J-S27016-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF A.J.K., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.J.W., III, FATHER | No. 2679 EDA 2014 |

Appeal from the Decree entered August 15, 2014,
in the Court of Common Pleas of Philadelphia County, Family
Court, at No: CP-51-AP-0000235-2013,
FID: 51-FN-001519-2013

BEFORE:  FORD ELLIOTT, P.J.E., STABILE, and FITZGERALD,* JJ.

MEMORANDUM BY STABILE, J.:                **FILED JUNE 23, 2015**

R.J.W., III, (Father) appeals from the decree entered August 15, 2014, in the Court of Common Pleas of Philadelphia County, which involuntarily terminated his parental rights to his minor son, A.J.K. (Child).  We affirm.[1]

Father is the former boyfriend of H.K. (Mother).  Mother and Father separated shortly after the birth of Child in March of 2006.  Since that time, Father has had little involvement in Child's life.  On April 19, 2013, Mother filed a petition to involuntarily terminate Father's parental rights to Child.[2]  A termination hearing was held on October 16, 2013.  During the hearing, the trial court heard the testimony of Mother; Stepfather; Mother's mother, E.K.

---

\* Former Justice specially assigned to the Superior Court.

[1] We note that our review of this fast-track matter was delayed significantly, as the trial court did not forward the certified record to this Court until December 19, 2014, over two months  after its original due date of October 10, 2014.

[2] Mother and her husband, S.M. (Stepfather), filed a petition for adoption at the same time as the termination petition.

(Maternal Grandmother); Father; and Father's mother, M.W. (Paternal Grandmother). The hearing then was continued until October 25, 2013. On that date, the trial court interviewed Child *in camera*. On August 15, 2014, the court entered its decree terminating Father's parental rights.[3] Father timely filed a notice of appeal on September 10, 2014, along with a concise statement of errors complained of on appeal.

Father now raises the following issue for our review. "Did the [t]rial [c]ourt err in terminating the parental rights of [Father] in that clear and convincing evidence for terminating his parental rights did not exist?" Father's Brief at 6.

We consider Father's claim mindful of the following.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

---

[3] On October 25, 2013, the court entered an order requiring each party to file proposed findings of fact and conclusions of law, as well as a proposed decree, within 30 days of the date that the termination proceedings were transcribed. It is not clear from the record when the notes of testimony were transcribed. However, the parties did not comply with the court's order until June and July of 2014.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our courts apply a two-part analysis in reviewing a decree terminating parental rights. As we explained in ***In re L.M.***, 923 A.2d 505 (Pa. Super. 2007),

> [i]nitially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***Id.*** at 511 (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Sections 2511(a)(1) and (b), which provide as follows.

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(1).  To meet the requirements of this section, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties."  **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008) (citing **In re Adoption of R.J.S.**, 901 A.2d 502, 510 (Pa. Super. 2006)).  The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b).  **Id.**  (quoting **In re Adoption of Charles E.D.M.**, 708 A.2d 88, 92 (Pa. 1998)).

- 4 -

This Court has emphasized that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004)). Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citation omitted). Critically, incarceration does not relieve a parent of the obligation to perform parental duties. An incarcerated parent must "utilize available resources to continue a relationship" with his or her child. *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012) (discussing *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975)).

Instantly, the trial court concluded that Father "purposefully and decidedly abdicated his parental role" with respect to Child, and that Father "failed to vigorously work to insert and maintain himself in the life of the child in a meaningful way." Trial Court Opinion, 12/16/14, at 5 (unpaginated). Father argues that he made efforts to maintain contact with Child by sending letters to Mother, and trying to contact her. Father's Brief at 9. Father also contends that both he and his parents were prevented from seeing Child by Mother, as they feared she would call the police. *Id.*

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion by terminating Father's parental rights to Child. During the termination hearing, Mother testified that Father and Child have never resided together. N.T., 10/13/13, at 34-35, 43. Mother further explained that the last time she saw Father was in August of 2012, when he came to her home intoxicated and asked to see Child. *Id.* at 11, 36, 41, 46, 50. Mother stated that she did not permit Father to see Child, as Father no longer had visitation rights due to a November 2011 custody order. *Id.* at 11-12, 29, 50. Mother called the police, who asked Father to leave. *Id.* at 36-37, 46, 50-51.

Mother also was asked about Father's involvement with Child during the six-month period preceding the filing of the termination petition on April 19, 2013. Mother testified that she was not contacted by Father in any way from October of 2012 until January of 2013. *Id.* at 15. Mother explained that Father sent a letter asking for pictures of Child in January of 2013. *Id.* at 15, 38, 43, 50, 52. Mother did not respond to the letter. *Id.* at 38. Father had no further contact with Mother from January of 2013 until April of 2013. *Id.* at 12-15. Mother acknowledged that she changed residences in September of 2012, and that her current address is confidential. *Id.* at 16, 40. However, she stated that she set up a forwarding address at the post office, such that mail sent to her prior address would be directed to her current home. *Id.* Mother also noted that Father has her cellphone number,

and that this number has not changed in "[s]ix years or so." *Id.* at 16-17, 41.

Maternal Grandmother testified that she resides in the same home where she has lived for the past 34 years. *Id.* at 58-59. Maternal Grandmother stated that Father lived in her home with Mother from approximately November of 2005 until February of 2006. *Id.* at 58. Father also knows Maternal Grandmother's phone number. *Id.* at 59. Despite this, Maternal Grandmother indicated that Father did not send any letters, call her on the phone, or make any contact with her at all between October of 2012 and April of 2013. *Id.* at 59-60.

Father testified that Mother informed him in April of 2006 that he "will never see [Child] again," which prompted Father to file a custody petition. *Id.* at 66, 105. Father was awarded visitation with Child twice per week, which he attended consistently for a period four years. *Id.* at 67. Father claimed that these visits stopped because Mother "just started to call the cops if I went over there . . . ." *Id.* at 69. Father stated that he sometimes tried to see Child when he was not scheduled to do so, but stated that Mother would call the police during even his scheduled visitation periods. *Id.* at 69, 100. Father stated that he at one point filed a contempt petition, but that his petition was withdrawn because Mother relented and let him see Child. *Id.* at 100-01. Father admitted that he last saw Child in 2011, and that he lost his visitation rights because "I could not stay out of jail." *Id.* at 99, 108. Specifically, Father testified that he was incarcerated at an

unspecified time, and that he was released in approximately December of 2010. *Id.* at 81. Father again was arrested in June or July of 2011, and was released on March 22, 2012. *Id.* at 74, 77, 80. Finally, Father was incarcerated starting on May 30, 2012. *Id.* at 77. Father explained that he was released on July 30, 2013, and that he now works detailing cars. *Id.* at 64, 77.

Father claimed that, while incarcerated, he would send letters to Mother and Child "[m]aybe once a week" at Mother's former address, and that "I would show up and try to see my son" during the times when he was not incarcerated. *Id.* at 70-71, 86, 107. Father stated that he had been incarcerated for 16 or 18 months over the previous two years, and he sent letters during "the beginning of the 18 months that I was incarcerated." *Id.* at 70, 84-85, 107. Father specified that the letters were sent "[b]efore I left county, I was in the county for two months." *Id.* at 85. Father also stated that he sent letters during "the last six months" prior to the termination hearing. *Id.* at 107. According to Father, he used to called Mother "all the time" while he was incarcerated, but this stopped in July of 2012 because Mother stopped answering her phone. *Id.* at 75-76, 93-94. Father reported that Maternal Grandmother told him that "she would call the cops if I contacted her" or Mother. *Id.* at 72, 94.

Paternal Grandmother testified that she visited with Child twice per week for about five years. *Id.* at 112-13. She stated that Father "always wrote letters to his son," and that she used to sit and read letters to Child

"all the time." *Id.* at 117. However, a dispute arose concerning Father's payment of child support about two years prior to the termination hearing, and Paternal Grandmother has not seen Child since that time. *Id.* at 113. Paternal Grandmother testified that the last time she tried to see Child, Mother told her to leave the property and called the police, and that "there's been cops called, I don't know how many times when we went to go pick up [Child]." *Id.* at 114, 118. Paternal Grandmother admitted that she has not taken any steps to see Child since then. *Id.* at 114. Reportedly, Mother also had informed Paternal Grandmother that Maternal Grandmother would throw away any pictures that Father sent to Child. *Id.* at 117.

The record supports the finding of the trial court that Father has failed to perform parental duties for a period of at least six months prior to the filing of the termination petition. The court was free to accept Mother's testimony that Father sent only a single letter during the relevant six-month period, asking for pictures of Child. This displays a "merely passive interest" in the development of Child, and is not sufficient to prevent termination. *B.,N.M.*, 856 A.2d at 855. Moreover, even if the court were to credit Father's testimony, Father indicated that he did little, if anything, to maintain a relationship with Child during the relevant time. Father stated that he sent Child letters during the first two months of his most recent incarceration, which took place well outside of the relevant period. Father also stated that he sent Child letters within the six months preceding the termination hearing, which overlapped the relevant period only by a few

days. Moreover, while Father was incarcerated during this six-month period, and, while both Father and Paternal Grandmother testified concerning Mother's efforts at preventing Father from seeing Child, these circumstances do not excuse Father from endeavoring to perform parental duties. *Id.*; *S.P.*, 47 A.3d at 828. In order to maintain his parental rights, Father was required to make a good faith effort at maintaining a relationship with Child. *B.,N.M.*, 856 A.2d at 855. He failed to do so.

We next consider whether the trial court abused its discretion by terminating Father's parental rights under Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and

citations omitted).

In this case the trial court concluded that Child has no bond with

Father, and that Father "has had no significant contact with the child for the

majority of his life." Trial Court Opinion, 12/16/14, at 5 (unpaginated). In

contrast, the court found that Child has a "serious bond" with Stepfather,

who is "the only father the child knows . . . ." *Id.* Father argues that

termination is not in Child's best interest because "there was nothing in the

record, which would indicate any beneficial effect for" Child. Father's Brief at

9.

We again conclude that the trial court did not abuse its discretion.

Mother testified that Child does not remember Father, and that Child instead

calls Stepfather "dad." *Id.* at 19-20, 38-39, 42. Maternal Grandmother

testified that Child and Stepfather have a "[w]onderful" relationship. *Id.* at

60. She described Stepfather as "a father in every since [*sic*] of the word

other than biological." *Id.* at 60-61. Stepfather agreed that he and Child

have a "great" relationship. *Id.* at 53-54. Stepfather stated that Child calls

Father by his first name, and that Child "knows his name, that's pretty much

all he ever really says." *Id.* at 55.

In contrast, Paternal Grandmother testified that, the last time she saw

Father and Child together, Child ran up to Father, and called him "dad." *Id.*

- 11 -

at 116, 119. According to Paternal Grandmother, Child has stated that "I really, really, miss my dad, but he's never coming back." *Id.* at 119. Paternal Grandmother indicated that Child "loves his father, it's as simple as that." *Id.* at 116. Similarly, Father testified that he has an "[a]wesome" relationship with Child, that he loves Child, and that Child "knows who I am. He knows I am his father." *Id.* at 73, 76. However, Father conceded that Child "is in[]a better spot," and that it would be best for Child to "stay with his mother and [Stepfather]. I believe he's in the best place that he could be . . . ." *Id.* at 108, 110. Despite this admission Father indicated that "I don't want to lose him," and "as far as me not being in his life, I don't see that as fair." *Id.*

During his interview with the trial court, Child was asked who his father is. N.T., 10/25/2013, at 7. Child responded with Stepfather's first name. *Id.* Child stated that he does not remember Father, but that he did remember getting a present from Father's parents when he was 4 or 5 years old. *Id.* at 7-8. Child further stated that he would not recognize Father if he were to see him now. *Id*. at 10.

Thus, the record supports the trial court's conclusion that Father and Child do not have a bond, as Child does not remember who Father is. In contrast, Child considers Stepfather to be his father. Under the circumstances, it would serve Child's needs and welfare for Father's parental rights to be terminated, as termination would permit Child to be adopted by

Stepfather, and would provide Child with permanence and stability. We discern no abuse of discretion.

Accordingly, because we conclude that Father's claim does not entitle him to relief, we affirm the decree of the trial court.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/23/2015